1

*E-Filed 09/03/2010*

2

3

4

5

6

7                              IN THE UNITED STATES DISTRICT COURT

8                          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                                    SAN FRANCISCO DIVISION

10   UNITED STATES OF AMERICA,                    No. CR 10-00171 RS

11                    Plaintiff,                  **ORDER (1) DENYING MOTIONS TO
                                                  SUPPRESS, (2) DENYING MOTION
12          v.                                    FOR A BILL OF PARTICULARS, (3)
                                                  DENYING IN PART AND GRANTING
13   INSOO KIM,                                   IN PART MOTION TO COMPEL**

14                    Defendant.
     _____/
15

16                                      I. INTRODUCTION

17          This case arises from an investigation by the Internal Revenue Service of defendant Insoo

18   Kim.  On March 9, 2010, Kim was indicted and charged with three counts of willfully subscribing a

19   false income tax return, in violation of Title 26, United States Code, section 7206(1), and eight

20   counts of willfully failing to pay over employment taxes, in violation of Title 26, United States

21   Code, section 7202.  Kim has filed motions: (1) to suppress evidence obtained by the IRS in

22   violation of his constitutional rights; (2) for a bill of particulars; and (3) to compel discovery.  The

23   Government's response and the defendant's reply have been filed, and the parties appeared for oral

24   argument on the motions on August 10, 2010.  At oral argument, the Court requested the parties to

25   submit additional briefing on the question of whether Kim was in custody during his May 21, 2008

26   interview with IRS Special Agents, looking particularly at *Beckwith v. United States*, 424 U.S. 341

27   (1976) and its progeny.  The parties have submitted the additional briefing.  For the reasons stated

28   below, the motions are denied.

II. BACKGROUND

Kim is a native of South Korea who moved to the United States in 1981.  In 1984, after learning the painting trade, he opened a painting business called Melody Painting, with its principal place of business in Santa Clara, California.  It is the purported income from Melody Painting that is at issue in this case.  From 1987 until 2007, Kim received accounting and tax advice regarding his business from John Pak, a certified public accountant who held Kim's power of attorney.

In April 2006, the IRS audited tax returns for both Kim and Melody Painting.  Revenue Agent Wenjun Wu ("RA Wu"), who conducted the audit, first met with Kim and Pak on May 16, 2006.  Prior to that meeting, RA Wu had requested all documentation to support Kim's reported income.  Kim brought records for three personal accounts and one business account to the meeting and represented that they comprised the entirety of his financial records.  RA Wu reviewed these documents, and determined that the bank accounts contained almost $394,000 in unexplained deposits.  She told Kim to explain, with supporting documentation, the origin of these excess deposits.  On September 7, 2006 Kim provided documentation for some of the money, but was unable to explain approximately $200,000 of the excess deposits.  According to RA Wu, Kim asserted that the $200,000 was a loan from a family member, but that he did not want to look for the documents supporting the loan.

With explanations for the excess deposits not yet forthcoming, RA Wu issued summonses to the banks that Kim had identified in their first meeting.  From these summonses, RA Wu discovered five additional bank accounts where Kim had deposited business receipts.  In April 2007, after the summonses were returned, RA Wu spoke with Kristen Hayden ("FRS Hayden"), an IRS fraud referral specialist, and prepared a Fraud Development Status report that she transmitted to her Group Manager.  According to RA Wu, IRS protocol requires consultation with such a fraud technical specialist in cases where unreported income appears to exceed $10,000.[1]

RA Wu continued to work on the case for the next two months, including a meeting on July 18, 2007 with FRS Hayden.  On August 16, 2007, she met again with Kim and Pak at Melody

---

[1] The Internal Revenue Manual provides: "When affirmative acts (firm indications) of fraud/willfulness exist and criminal criteria are met, the compliance employee should refer the case to Criminal Investigation (CI) via Form 2797, *Referral Report of Potential Criminal Fraud Cases*. The fraud technical advisor (FTA) is available to assist (determine if firm indications of fraud/willfulness are present, criminal criteria has been met, etc.)."  IRM § 25.1.3.1 (10-30-2009).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Painting, where she asked Kim whether there were any additional bank accounts in his name.  Kim acknowledged having three additional bank accounts, and when RA Wu asked him why he had not disclosed these accounts earlier he said that he paid illegal workers cash through these accounts and did not want to risk getting those workers into trouble.  When RA Wu said that paying illegal workers was fraud, Kim did not respond.  RA Wu then asked Kim for documents to substantiate the wages he claimed to have paid, as well as invoices to substantiate the income that was paid into the additional bank accounts.  Kim provided those documents shortly thereafter.[2]

RA Wu met again on August 28, 2007 with FRS Hayden, who prepared a report of the meeting and laid out a number of action items, including requesting invoices from Kim for each tax year, issuing summonses for cancelled checks, asking Kim about his investments, and confirming whether Kim maintained cash in any safe deposit boxes.  RA Wu met twice more with Kim and Pak after this August 28 meeting.  On October 1, 2007, she and her Group Manager inquired about the safe deposit boxes, which Kim said he no longer used, and received from Kim a summary of wages that reflected an additional $688,011 in expenses.  On December 4, 2007, she requested and received from Kim an audit report that the California Employment Development Department had conducted on his 2004 employment tax returns.  RA Wu then met with her Group Manager and FRS Hayden on January 8, 2008 before eventually referring the case to the Criminal Investigation unit on January 28, 2008.

After the case had been referred to Criminal Investigation, IRS Special Agent Wendy Bergland ("SA Bergland"), IRS Special Agent Joseph Camillucci, and IRS Computer Operator Administrator Sung Shin ("COA Shin") interviewed Kim at Pak's office on May 21, 2008.  Pak acted as the primary translator between SA Bergland and Kim, who spoke primarily in Korean during the interview, with COA Shin acting as a secondary translator.  There is no evidence,

---

[2] Defendant maintains in his motion, and at oral argument, that RA Wu failed to record in her daily activity report that she collected these documents from Kim, suggesting an attempt by the Government to conceal its true intent in conducting the civil audit.  A review of the evidence submitted, however, indicates that this is not the case.  In a memorandum she prepared on June 29, 2009, Special Agent Wendy Bergland wrote that RA Wu met with Kim "[i]n August 2007" and that "[t]he following day, KIM provided RA Wu with three bankers boxes containing the bank records and invoices pertaining to unreported bank accounts."  Def. Mot. to Supp., Exh. D.  In her daily activity report, RA Wu wrote that she met with Kim on August 16, 2007 and that she "[p]ick[ed] up invoices for income not reported from taxpayer's business" on August 31, 2007.  Def. Mot. to Supp., Exh. G.  Contrary to Kim's assertions, and as discussed below, nothing in the evidence presented suggests any nefarious or deceptive conduct by the Government.

No. C 09-00749

United States District Court
For the Northern District of California

1   however, that either Pak or COA Shin is a certified translator.  In fact, at oral argument the

2   Government acknowledged that COA Shin is not certified as a translator, and in his declaration Pak

3   maintains that he could not have fully translated the conversation because he similarly is not a

4   qualified translator and does not understand many legal terms sufficiently to translate them from

5   English to Korean.

6        During the interview, SA Bergland told Pak that the civil audit had been terminated and that

7   the IRS was now conducting a criminal investigation.  She explained that, while Kim had been

8   required to speak to RA Wu during the civil audit, his communication with SA Bergland was

9   completely voluntary and that he was not required to speak to anyone during a criminal

10  investigation.  According to SA Bergland, Pak translated to Kim who stated that he understood.  SA

11  Bergland then read IRS Document 5661, *Non-Custody Statement of Rights, Revision 3-2001*, to Kim

12  in English.  COA Shin, who had translated a copy of Document 5661 into Korean the night before

13  the interview, read and provided to Kim the Korean translation of the non-custody statements of

14  rights.  At oral argument, the Government represented that COA Shin did not, however, retain the

15  written translation that he had prepared.  According to SA Bergland, Pak explained the right against

16  self incrimination to Kim, and when SA Bergland asked if Kim understood his rights Kim replied,

17  "Yes."  SA Berlgand also maintains that she heard Pak say the words "Fifth Amendment" and

18  "lawyer" in English to Kim.[3]  After advising Kim of his rights, SA Bergland conducted an

19  interview.

20                              III. DISCUSSION

21  A.    Motion to Suppress

22        1. *Fourth Amendment Search and Seizure*

23        Kim has moved to suppress all evidence obtained by the IRS from August 16, 2007 until the

24  present based upon a violation of his Fourth Amendment right against unreasonable searches and

25  seizures.  The United States Constitution guarantees that, "The right of the people to be secure in

26  their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

---

27  [3] Pak asserts that he did not translate verbatim everything SA Bergland said, that he does not recall
28  whether he received a copy of Document 5661 or whether Shin translated the document verbatim,
    and that he did not translate anything about the Fifth Amendment because he does not have a
    general understanding of the Fifth Amendment himself.  He also maintains that he does not believe
    Kim understood the information contained in Document 5661.

**United States District Court**
For the Northern District of California

violated and no Warrants shall issue, but upon probable cause." U.S. Const. amend IV.  A search conducted without a warrant is unreasonable, and any evidence obtained through such a search is subject to exclusion, unless there is evidence of one of the few specifically established and well-delineated exceptions to a warrantless search.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  One such exception is when the government obtains voluntary consent of the person to be searched prior to conducting the search.  *Id.*

In tax cases, "a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of the Internal Revenue agent."  *United States v. Robson*, 477 F.2d 13, 17 (9th Cir. 1973).  The Fifth Circuit, in addressing situations where evidence is obtained during a civil audit that the Government later attempts to introduce as part of a criminal prosecution, has found that the burden of determining whether or not the IRS has committed deception rests with the defendant; the record "must disclose some affirmative misrepresentation to establish the existence of fraud, and the showing must be clear and convincing."  *U.S. v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977) (citing *United States v. Prudden*, 424 F.2d 1021, 1033 (5th Cir. 1970).  In *Tweel*, a taxpayer was prosecuted for tax evasion and moved to suppress evidence obtained through a civil audit.  *Id.*  When the taxpayer's accountant had asked if a "special agent" was involved in the investigation, the revenue agent replied "no" without disclosing that the audit was in fact conducted at the specific request of the Organized Crime and Racketeering Section of the Department of Justice, which is only involved in criminal prosecutions.  *Id.*  The court found that the revenue agent's failure to tell the taxpayer of the "obvious criminal nature of this investigation was a sneaky deliberate deception."  *Id.*  Expanding on *Tweel*, the Fifth Circuit has held that suppression is proper if: "1) the IRS had firm indications of fraud by the defendant, 2) there is clear and convincing evidence that the IRS affirmatively and intentionally misled the defendant, and 3) the IRS's conduct resulted in prejudice to defendant's constitutional rights."  *U.S. v. Grunewald*, 987 F.2d 531, 534 (5th Cir. 1993).

The Ninth Circuit has adopted the rule in *Tweel*, requiring that there be "clear and convincing evidence of [] actual deception or trickery on the part of the Government" and that the defendant establish "some affirmative misrepresentation" to warrant suppression of evidence obtained during a civil audit.  *United States v. Bridges*, 344 F.3d 1010, 1020 (9th Cir. 2003) (citing

No. C 09-00749

1   *Tweel*, 550 F.2d at 299).  Additionally, the Ninth Circuit has confirmed that silence, unless

2   intentionally misleading, will not be equated with fraud.  *See Robson*, 477 F.2d at 17-18 ("the

3   failure of an IRS agent… to warn a taxpayer that an audit may have potential criminal ramifications

4   does not render the search unreasonable."); *see also*, *Prudden*, 424 F.2d at 1035 (finding revenue

5   agent's failure to warn, absent any affirmative misrepresentation, that an audit may result in criminal

6   charges is not deceit because "[a]ny reasonable person is bound to be aware that the filing of an

7   incorrect tax return may result in a charge of wrongdoing.").

8         Kim relies on *Tweel* and *United States v. Toussaint* in support of his argument that RA Wu's

9   conduct was deceitful.  In *Toussaint*, the taxpayer claimed a $190,000 theft loss on a painting.  456

10  F.Supp 1069 (D.C. Tex., 1978).  After an initial interview with the taxpayer, in which he said the

11  painting had been a gift from his grandfather, the revenue agent found to the contrary: the

12  grandfather was not wealthy, no gift tax had been filed, and the taxpayer had no authentication for

13  the painting.  *Id*. at 1071.  Rather than refer the case for criminal investigation, however, the revenue

14  agent continued to investigate himself and interviewed the taxpayer again on a number of occasions.

15  *Id*.  The court suppressed all evidence obtained after the initial interview because the revenue agent

16  had "discovered firm (in fact almost conclusive) indications of fraud," but had failed to refer the

17  case to the criminal division as was required under IRS policies.  *Id*.  The court found this failure to

18  comply with IRS regulations to be dispositive.  *Toussaint*, 456 F.Supp at 1073.  The court was also

19  quick to distinguish the situation before it, where the indications of fraud were clear, from one

20  where a court had found it was instead possible that "the taxpayer had been a very poor

21  bookkeeper."  *Id*. at 1072 (citing *United States v. Lockyer*, 448 F.2d 417 (10th Cir. 1971)).

22        The case here, however, is markedly different from the facts in both *Tweel* and *Toussaint*.

23  Unlike the revenue agent in *Tweel*, RA Wu never made any affirmative representations regarding

24  the status of a criminal investigation.  Although she was silent on the matter, there is no indication

25  that this silence rose to the level of intentionally deceptive or tricky behavior; RA Wu's silence

26  flowed from the fact that neither Kim nor Pak had ever asked her whether Kim's conduct was under

27  criminal review.  Indeed, there is no evidence, let alone clear and convincing evidence, that she

28  made any statements, or answered any questions, in such a way that would lead Kim to believe a

**United States District Court**
For the Northern District of California

No. C 09-00749

United States District Court
For the Northern District of California

1    criminal investigation was not possible.[4]   As the Ninth Circuit has held, an agent's failure to warn

2    that an audit may result in criminal charges does not render a search unreasonable.  *See Robson*, 477

3    F.2d at 17-18.

4          Similarly, RA Wu's conduct never approached the level of deceit found in *Toussaint*.

5    Unlike in that case, involving "firm (in fact almost conclusive) indications of fraud," the evidence

6    here reflects that RA Wu was investigating the possibility that Kim's failure to report accurately his

7    income and pay his employment taxes was willful misconduct, as opposed to merely an accounting

8    discrepancy.  In the course of that investigation, she contacted the person within her office (FRS

9    Hayden) dedicated to assist her in making that determination.  In *Toussaint*, the agent knew almost

10   conclusively after the first interview that the taxpayer had lied about ever owning the painting that

11   he claimed on his tax returns to have been stolen.  456 F.Supp at 1073.  Here, by contrast, there is

12   no evidence that RA Wu had firm indications Kim's conduct was potentially criminal until she

13   reviewed all the evidence supporting his business receipts and expenses.  Up to that point, the

14   possibility remained that Kim was simply a poor bookkeeper, which as the *Toussaint* court said does

15   not constitute a firm indication of fraud.  *See Id.*[5]   Kim's assertions otherwise are, at best,

16   speculative.  Moreover, while RA Wu did communicate with a fraud referral specialist prior to

17   engaging a special agent in January 2008, Kim has presented no authority for the proposition that a

18

19

20

21   [4] During the August 16, 2007 meeting, RA Wu explained to Kim that paying illegal workers is
     fraud.  The revelation that Kim may have been paying illegal workers, however, did not require RA
22   Wu to suspend her civil audit and refer the case for criminal tax review because the information was
     offered as an explanation for Kim's excess deposits and additional bank accounts.  The focus of RA
23   Wu's investigation, and of her document requests on August 16, October 1 and December 4, 2007,
     was Kim's unreported income; there is no evidence that the Government ever investigated Kim for,
24   nor has it charged him with, making payments to illegal workers.  Moreover, evidence that RA Wu
     warned Kim that his payments to illegal workers could have been fraudulent is inconsistent with the
25   notion that she was trying to trick or deceive him in any way.
     [5] The court in *Toussaint* also relied upon the fact that the revenue agent had violated IRS policies
26   when he failed to transfer the case.  456 F.Supp at 1073.  Since *Toussaint*, however, the Supreme
     Court has held that, absent any statutory or Constitutional violation, the exclusionary rule is
27   inapplicable where evidence is obtained solely in violation of an IRS regulation.  *United States v.
     Caceres*, 440 U.S. 741, 754-755 (1979); *see also*, *United States v. Snowadzki*, 723 F.2d 1427, 1430-
28   31 (9th Cir. 1984).  As discussed in more detail below, even assuming that the agents did violate
     IRS policy, none of Kim's Constitutional or statutory rights were violated during the Government's
     investigation.

No. C 09-00749

7

1    revenue agent who simply contacts a fraud referral specialist (as opposed to a special agent)

2    somehow places a civil audit within the ambit of a criminal investigation.[6]

3         Indeed, this case is more akin to *Robson*, in which the Ninth Circuit reversed an order

4    granting a motion to suppress where a revenue agent, who had been forwarded a case after the

5    Intelligence Division (which was conducting an initial criminal review) decided it could not yet

6    bring criminal charges, interviewed the taxpayer without telling him that the purpose of the audit

7    was to verify an informant's tip as to tax evasion.  477 F.2d at 13.  After interviewing the taxpayer,

8    and confirming that there indeed had been fraud, the revenue agent then referred the case back to the

9    Intelligence Division for criminal review.  *Id*. at 15.  Despite the close link between the criminal and

10   the civil investigations, the Ninth Circuit found that the taxpayer's consent to the search of his

11   records was not induced by deceit owing to the absence of evidence that the revenue agent had made

12   any affirmatively misleading statements regarding the nature of the investigation.  *Id*.  Here, RA Wu

13   similarly made no affirmatively misleading statements to Kim or his accountant regarding the nature

14   of her audit.  Moreover, whereas there was a clear connection between the civil and criminal case

15   from the very beginning in *Robson*, the link between the civil audit and the criminal investigation

16   here was attenuated; RA Wu simply engaged the help of a fraud referral specialist after discovering

17   that Kim had more than $10,000 of unreported income, but did not refer the case for criminal

18   review, or even communicate with an IRS special agent, until January 2008, after she had seen all of

19   Kim's invoices and bank receipts.  Despite Kim's assertions otherwise, there is no evidence RA Wu

20   ever acted at the behest of, or in concert with, anyone from the Criminal Investigation unit until the

21   case was officially transferred.  And again, Kim has presented no authority for the proposition that a

22   revenue agent who simply contacts a fraud referral specialist (as opposed to a special agent)

23   transforms a civil audit into a criminal investigation.  Therefore, because Kim has failed to establish

24   by clear and convincing evidence that RA Wu affirmatively and intentionally misled Kim, or that

25   her conduct constituted trickery or deception, the motion to suppress all evidence obtained by the

26   IRS from August 16, 2007 to the present must be denied.

27   //

28
---
[6] As the Internal Revenue Manual provides, fraud technical advisors are available to assist revenue agents in making criminals by helping them "determine if firm indications of fraud/willfulness are present, criminal criteria has been met, etc."  IRM § 25.1.3.1.

2. *Waiver of Fifth Amendment Right Against Self Incrimination*

Kim also seeks to suppress any and all statements he made from August 16, 2007 to the present, including those made on May 21, 2008, based upon a violation of his Fifth Amendment right to remain silent.  Kim argues that, due to his language barrier and the lack of a certified translator at the May 21, 2008 meeting with SA Bergland, he failed to understand his right to remain silent and therefore did not knowingly and intelligently waive his constitutional rights.

A touchstone of American criminal law is that an individual's rights under *Miranda v. Arizona* are triggered during custodial interrogation.  *See, e.g., Florida v. Powell*, 130 S.Ct. 1195, 1203 (2010); *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989).  Once a suspect is in custody, law enforcement cannot question that suspect absent a knowing, intelligent, and voluntary waiver of his right to remain silent.  *See, e.g., Iowa v. Tovar*, 541 U.S. 77, 81 (2004).  Whether or not an individual is subject to the compulsive nature of custody depends upon "the objective circumstances of the interrogation."  *Stansbury v. California,* 511 U.S. 318, 323 (1994).  This rule applies equally to an interrogation by IRS agents as it does to any other law enforcement personnel.  *See Beckwith v. U.S.*, 425 U.S. 341, 347 (1976) (holding that an interview with internal revenue agents in a defendant's home, where the agents read a non-custodial statement of rights, was not "so inherently coercive as to require" *Miranda* warnings). [7]

Kim argues in his supplemental briefing that *Beckwith* should not apply, and that the evidence should be suppressed regardless of whether or not he was in custody, because in *United States v. Sourapas*, 515 F.2d 295 (9th Cir. 1975), the Ninth Circuit found that evidence obtained by IRS activity in violation of its own regulations must be excluded.  Since *Sourapas*, however, this holding has been substantially narrowed such that "[a]bsent unusual circumstances, the exclusionary rule does not apply when IRS agents violate internal regulations, without also infringing on constitutional or statutory rights."  *United States v. Snowadzki*, 723 F.2d 1427, 1430-31 (9th Cir. 1984) (citation omitted).  Indeed, a year after the *Sourapas* ruling, the Ninth Circuit held in *Caceres* that, while it was "bound to follow" *Sourapas,* and thereby reverse a trial court's refusal to suppress

---

[7] Kim has moved to suppress any and all statements from August 16, 2007 to the present.  However, because *Miranda* does not apply where a taxpayer is interviewed by a revenue agent prior to the initiation of a criminal investigation, *see Toussaint*, 456 F.Supp at 1071 (citing *Beckwith*, 425 U.S. at 341), Kim's motion to suppress is denied to the extent it is premised on any interviews prior to May 21, 2008.

No. C 09-00749

evidence obtained as the result of a violation of IRS regulations, it also stated that "the suppression of evidence because of noncompliance with an administrative regulation only, without any showing of statutory or constitutional violation, may be a questionable approach." *United States v. Caceres,* 545 F.2d 1182, 1187 (9th Cir.1976), *rev'd*, 440 U.S. 741 (1984). The Supreme Court then went on to reverse the Ninth Circuit in *Caceres* and held that, while a court must enforce an agency regulation when compliance with the regulation is mandated by the Constitution or federal law, the exclusionary rule was inapplicable given the lack of a constitutional violation.  440 U.S. at 755.

   Here, Kim maintains that there were "unusual circumstances" during the May 21, 2008 interview (i.e., the fact that his primary language is Korean and that he never signed a written waiver), which triggered the exclusionary rule after the Government failed to administer a non-custodial statement of rights in accordance with IRS policy.  This argument is not persuasive. Indeed, the Court need not address whether the Government did in fact violate its internal regulations because, even assuming that the SA Bergland failed to administer the warnings as required by the Internal Revenue Manual, nothing in the circumstances surrounding the interview suggests "unusual circumstances" or a violation of Kim's constitutional rights.  As discussed below in more detail, the undisputed evidence reflects no indicia of coercion of the sort that courts regularly alight upon in finding violations of a suspect's Fifth Amendment rights.   Kim was interviewed in his own tax accountant's office at a time of his accountant's choosing, was told he did not have to speak to anyone during a criminal investigation, and was informed he could leave the interview at any time.  While the agents were certainly sloppy in administering the agency-required statement of rights, nothing in their actions can be characterized as coercive or deceptive, or as a violation of Kim's constitutionally protected rights.

   Alternatively, Kim argues that, even if *Beckwith* does apply, he was subject to a custodial interrogation and therefore should have been read his rights pursuant to *Miranda*.  The Ninth Circuit has held that "[w]hether a person is in 'custody or otherwise deprived of his freedom of action in any significant way,'… is answered by reviewing the totality of facts involved at the time of the alleged restraint." *U.S. v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  In making this review, a court looks at "the language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt, the

physical surroundings of the interrogation, the duration of the detention and the degree of pressure applied to detain the individual," and "determine[s] whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *Id.*

Here, even assuming that Kim's language barrier prevented him from understanding the full scope of the non-custodial statement of rights, nothing in the record suggests that the interview took place in a context where his freedom was restricted in any significant way or that "the behavior of the [IRS agents] was such as to overbear [his] will to resist." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); *see also Pierce v. Hartley*, 370 Fed.Appx. 851, 852 (9th Cir. 2010) (finding that a defendant was not subject to a custodial interrogation when he "went to the police station voluntarily, was told he was not under arrest and was free to leave, and voluntarily started confessing to burglaries."). Unlike in *Booth*, where the defendant was handcuffed prior to being searched, Kim was never restrained in any way. Indeed, SA Bergland mailed a letter to Kim informing him that the case had become a criminal investigation, and then coordinated with Pak a convenient time to meet with Kim at Pak's office. Once at his accountant's office, Kim was accompanied by Pak, was never handcuffed, was specifically told that he could leave, and was interviewed for less than two hours. There is no evidence that any of the agents were armed, threatened to handcuff or arrest Kim, or physically restrained him in any way. None of the circumstances of this interview indicate a coercive custodial setting that, under *Beckwith* and its progeny, would require SA Bergland to read Kim a *Miranda* warning. Therefore, because Kim's rights under *Miranda* had not been triggered, the Court need not address the validity of his waiver and his motion to suppress any and all statements he made from August 16, 2007 to the present, including those made on May 21, 2008, must be denied.

Kim has also requested that the Court conduct an evidentiary hearing to rule on the motions to suppress. None of the material proffered evidence, however, is in dispute. Moreover, even assuming Kim's version of events (including his difficulty with English and his depiction of the seating arrangements during the May 21, 2008 interview), the interview was not a coercive custodial environment. Therefore, Kim's request for an evidentiary hearing must be denied.

B.    <u>Motion for Bill of Particulars</u>

No. C 09-00749

United States District Court
For the Northern District of California

1    The decision to grant or deny a bill of particulars rests within the trial court's discretion, and

2    is appropriate where an indictment is ambiguous such that a defendant needs clarification in order to

3    prepare a defense. *U.S. v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983) (citations omitted). "[A bill of

4    particulars] is designed to apprise the defendant of the specific charges being presented to minimize

5    danger of surprise at trial, to aid in preparation and to protect against double jeopardy." *Id*. In other

6    words, the purpose of a bill of particulars is to clarify ambiguities in an indictment, not to serve as a

7    replacement for discovery requests. *Id*.; *see also*, *United States v. Ryland*, 806 F.2d 941, 942 (9th

8    Cir.1986) ("[a] defendant is not entitled to know all the evidence the government intends to produce

9    but only the theory of the government's case"); *U.S. v. Giese*, 597 F.2d 1170, 1180-1181 (9th Cir.

10   1979) ("full discovery obviates the need for a bill of particulars").

11       The indictment here is sufficient to apprise Kim of the specific charges being presented, to

12   aid him in preparation of his defense, to prevent surprise at trial, and to protect against double

13   jeopardy. Indeed, Kim's specific requests are more in the form of discovery requests, which the

14   Ninth Circuit has found to be an impermissible basis for a bill of particulars. *See Long*, 706 F.2d at

15   1054. In particular, Kim has asked for (1) specifics as to the method of calculation the Government

16   used to determine that he had underreported on his Schedule C and underpaid his FICA, (2)

17   descriptions of the evidence the Government relies upon in determining that Kim knew of the

18   underreporting, and (3) the names of the individuals for whom he underpaid FICA. Each of these

19   requests concern information that the Government is required to produce during discovery.

20   Therefore, a bill of particulars is unnecessary and Kim's motion must be denied.

21       C.    Motion to Compel Discovery

22       Kim made a broad discovery request, asking for any and all documents required under the

23   Federal Rules of Criminal Procedure and the Fourth, Fifth, and Sixth Amendments to the United

24   States Constitution. In a supplemental motion and at oral argument, Kim specifically requested (1)

25   documentation that COA Shin is a certified translator, (2) a copy of the translated IRS Document

26   5661, *Non-Custody Statement of Rights, Revision 3*-2001, and (3) a copy of RA Wu's files, of all

27   notes made by, or transmitted to, FRS Hayden and RA Wu's Group Manager, and of all

28   correspondence between the IRS and Kim. As to COA Shin's language competency and the

     translated non-custody statement of rights, the Government represented at oral argument that COA

No. C 09-00749

1   Shin is not a certified translator and that he did not retain a copy of the translation.  As to the agent

2   reports, at oral argument the Government argued that these documents are privileged pursuant to

3   Federal Rule of Criminal Procedure 16(a)(2).  Rule 16(a)(2), however, applies to "reports,

4   memoranda, or other internal government documents made by an attorney for the government or

5   other government agent in connection with investigating or prosecuting the case."  Fed. R. Crim. P.

6   16(a)(2).  Reports prepared by IRS agents, accordingly, are subject to production pursuant to Rule

7   16.  Therefore, Kim's motion to compel as to a copy of RA Wu's files, of all notes made by, or

8   transmitted to, FRS Hayden and RA Wu's Group Manager, and of all correspondence between the

9   IRS and Kim is granted.  The remainder of the motion is denied.

10                                    IV. CONCLUSION

11          For the reasons stated above, Kim's motions to suppress are denied.  His motion for a bill of

12   particulars is denied and his motion to compel discovery is granted in part and denied in part.  His

13   request for an evidentiary hearing is denied.

14

15          IT IS SO ORDERED.

16

17   Dated: 09/03/2010

18                                    _____
                                      RICHARD SEEBORG
19                                    UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

No. C 09-00749

13